CHIESA SHAHINIAN & GIANTOMASI PC
A. Ross Pearlson, Esq.
Brigitte M. Gladis, Esq.
One Boland Drive
West Orange, NJ  07052
Telephone:  973.325.1500
Facsimile:  973.325.1501

FRANKEL, RUBIN, KLEIN, PAYNE
 & PUDLOWSKI, P.C.
Mayer S. Klein, Esq.
(*pro hac vice* application forthcoming)
231 S. Bemiston Avenue
Suite 1111
Clayton, MO 63105
Telephone: 314.725.8000
Facsimile: 314.726.5837

*Attorneys for Plaintiff*
*Harborview Capital Partners, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HARBORVIEW CAPITAL PARTNERS, LLC,<br><br>              Plaintiff,<br><br>vs.<br><br>CROSS RIVER BANK,<br><br>              Defendant. | Civil Action No.<br><br><br>**COMPLAINT**<br><br>*Document Filed Electronically* |

Plaintiff, Harborview Capital Partners, LLC ("Plaintiff" or "Harborview"), by and through its undersigned counsel, for its complaint against Defendant, Cross River Bank ("Defendant" or "Cross River"), alleges as follows:

### PARTIES

1.      Plaintiff Harborview is a Delaware limited liability company authorized and existing under the laws of Delaware. Plaintiff's actions and statements set forth hereinafter occurred via its authorized agents, employees and representatives.

2.     Defendant Cross River is a New Jersey banking corporation with its principal place of business in Teaneck, New Jersey. Defendant's actions and statements set forth hereinafter occurred via its authorized agents, employees and representatives.

## JURISDICTION AND VENUE

3.     Plaintiff is a Delaware limited liability company and Defendant is a New Jersey entity and therefore there is diversity between the parties.

4.     The amount in controversy exceeds $75,000.

5.     Venue is proper in this Court since Defendant is a resident of the State of New Jersey and Plaintiff's cause of action arose in New Jersey.

## FACTS COMMON TO ALL COUNTS

### *Opening of Accounts*

6.     Cross River was established in 2008, with Mr. Gilles Gade ("Gade") as its President. Cross River's primary place of business is 885 Teaneck Rd, Teaneck, NJ 07666.

7.     In 2013, Gade maintained a social relationship with Mr. Ephraim Kutner ("Kutner"), President of Harborview.

8.     In 2013, Gade and Kutner discussed Harborview, a new business that Kutner had formed with his brother, Jonathan Kutner. Gade asked Kutner to deposit into Cross River certain funds belonging to Harborview. Cross River made this request of Harborview to help Cross River establish itself financially and grow its modest base of assets/deposits.

9.     After receiving Cross River's request for deposits, Harborview expressed concern regarding the safety of the monies that Harborview was requested to deposit into Cross River.

10.     In response to Harborview's concerns, Cross River assured Harborview that Harborview's money would be secure at Cross River.

2

11.     In reliance thereon, Harborview began depositing funds at Cross River. Such deposits ultimately totaled the sum of $20,000,000.00, within various accounts at Cross River.

### *Harborview's Patterns and Practices*

12.     From 2014 onward, Harborview was a substantial customer of Cross River. Through Harborview depositing millions of dollars into its various accounts at Cross River, Cross River became familiar with the business of Harborview.

13.     Specifically, Cross River learned that the business of Harborview was domestic in nature, and that Harborview did not transact any business outside of the United States.

14.     Throughout the relationship that Harborview maintained with Cross River, Harborview set forth in writing to Cross River, via NUMEROUS ACCOUNT OPENING DATA ENTRY FORMS executed by Harborview and its related or affiliated entities, that Harborview did not engage in foreign wire activity; the monthly dollar value of Harborview's foreign wire transfers was zero; and that Harborview did not conduct business of a foreign nature.

15.     This information was relayed to Cross River on a form generated by Cross River and given to Harborview as its customer. Cross River asked Harborview to complete this form in order for Cross River to learn the type of business that Harborview transacts, as well as the type of business that Harborview does not transact.

16.     In January 2015, when Harborview opened an operating account at Cross River, the Account Opening Data Entry Form noted the specific Trade Area as USA and checked "no" with regards to business conducted of foreign nature. See **Exhibit "A"**.

17.     On or about January 17, 2018, Harborview maintained a savings account with Cross River, known as account number xxxxxxxxx7 ("Account").

18.     When Harborview opened the Account, Harborview again noted within the

3

Account Opening Data Entry Form that the Trade Area was USA, that Harborview's foreign wire transfers was zero, and that Harborview did not conduct any foreign business.  See **Exhibit "B"**.

19.     In summary, Harborview repeatedly advised Cross River in writing that Harborview did not conduct foreign business and did not make foreign wire transfers.

20.     Harborview reasonably relied on the fact that the Cross River would read the information submitted to it by Harborview, get to know Harborview as a customer, and take steps to ensure the parameters set by Harborview in writing on Cross River's forms would be honored.

21.     Nevertheless, upon receipt of Harborview's instructions, Cross River did not take commercially reasonable security measures, such as coding Harborview's accounts within Cross River's wire room such that only domestic wires would be processed.

22.     From 2014 until August 16, 2018, Harborview made 1,171 domestic wire transfers from its various accounts at Cross River.

23.     Each and every one of the aforesaid wire transfers were domestic wire transfers.

24.     Each and every one of the aforesaid domestic wire transfers were successfully accomplished; not one of the aforesaid 1,171 domestic wire transfers failed to transfer funds to its intended beneficiary.

25.     Until August 16, 2018, there were no international wire transfers sent or initiated from any of the Harborview accounts at Cross River.

### *The Fraudulent Transfers*

26.     At some point prior to August 16, 2018, unbeknownst to Harborview, the CEO of Harborview's e-mail account was hacked.

27.     The hacker added a rule to auto-delete all mail to the CEO's email inbox, which

allowed the hacker to send and receive emails from the CEO's account without the CEO's knowledge.

28.     From August 16, 2018 through August 27, 2018, the hacker used the CEO's email account to direct Harborview's Accounting Manager to wire funds internationally. Harborview's Accounting Manager had no knowledge that she was dealing with the hacker as opposed to the CEO of Harborview.

29.     This hacking scheme was well known in the banking industry as "CEO Fraud" or "Business Email Compromise."[1]

30.     At the hacker's direction, Harborview's Accounting Manager completed four wire transfer forms in total and sent them to Cross River Bank.

31.     Cross River processed four (4) international wire transfers ("Wire Transfers") from Harborview's Account as follows:   $420,000.00 on August 16, 2018; $95,000.00 on August 17, 2018; $325,000.00 on August 24, 2018; and $955,000.00 on August 27, 2018.

32.     Each transfer was directed to Hang Seng Bank in Hong Kong.

33.     Upon receipt of each Wire Transfer form, Cross River contacted Harborview's Accounting Manager to confirm the details of the transaction.

34.     Thus, Cross River contacted the very person who was unknowingly receiving direction from the hacker to confirm each Wire Transfer.

35.     Cross River's actions belied a security procedure that did not account for the well-known methodology of CEO Fraud.[2]

---

[1] See further information infra, ¶¶ 54 et. seq.

[2] All allegations herein regarding Cross River's security procedures are set forth upon information and belief, as despite multiple written requests from Harborview, Cross River has refused and continues to refuse to provide Harborview with Cross River's security procedures that were in place at the time of the fraudulent Wire Transfers.

36.     Moreover, Cross River's actions in processing the Wire Transfers to various accounts at Hang Seng Bank in Hong Kong, in direct contradiction to the express directions of Harborview that there were to be no international wire transfers from the Account, showed Cross River did not have the most basic knowledge of its customer.

### Cross River's Inept Response to the Fraudulent Transfers

*a) Cross River Fails to Promptly Advise Harborview of the Failed Wire Transfer*

37.     The initial Wire Transfer of August 16, 2018 failed to properly process from Cross River to Hang Seng Bank. Such failure occurred on August 16, 2018, and continued on August 17, 18, 19, 20, and 21, 2018 with such Wire Transfer failing to successfully occur each time.

38.     On August 17, 2018, Cross River learned that the initial Wire Transfer of August 16, 2018 was not successful. Yet, Cross River failed to notify Harborview about the failed Wire Transfer until August 21, 2018.

39.     Specifically, on August 21, 2018, five (5) days after Cross River processed the initial Wire Transfer, Cross River notified Harborview that the August 16, 2018 Wire Transfer did not successfully transfer.

40.     By failing to advise Harborview that the August 16 wire did not successfully transfer from August 16, 2018 through August 21, 2018, Cross River allowed the matter to remain unresolved for five days.

41.     While the initial Wire Transfer of August 16, 2018 was not successful, the remaining three (3) Wire Transfers, totaling the sum of $1,375,000.00 were successfully completed.

42.     These three (3) Wire Transfers would not have been made but for Cross River's failure to follow commercially reasonable procedures to timely notify Harborview of the failed

initial Wire Transfer.

43.     Further, upon information and belief, Cross River failed to follow its own policies and/ or the applicable federal banking regulations when it failed to timely notify Harborview as to the subject failed wire transfer. This allegation is pled upon information and belief as Cross River has failed and refused to turn over to Harborview the applicable banking policies that Cross River maintained at the time of the subject failed wire transfer.

*b) Cross River Fails to Investigate the Failed Wire Transfer*

44.     In addition to not timely notifying Harborview of the failed August 16, 2018 Wire Transfer, Defendant also failed to investigate the cause of the failed Wire Transfer.

45.     Cross River exercised no due diligence in order to determine the cause of the failed wire transfer and simply stated to Harborview on August 21, 2018, that the wire did not successfully transfer.

46.     Cross River did not try to identify the source of the failure, nor did it reasonably investigate why Cross River's numerous attempts at resending the August 16, 2018 Wire Transfer failed.

47.     This was a lapse in security on Cross River's part.

48.     Had Cross River properly and reasonably investigated the failure of the August 16, 2018 Wire Transfer, Cross River would have discovered that the Wire Transfer was fraudulent, thus preventing the three subsequent Wire Transfers from being completed.

49.     The loss of $1,375,000.00 by Harborview would not have occurred but for Cross River's failure to have and/or implement commercially reasonable security procedures requiring Cross River to investigate the cause of the failed August 16, 2018 Wire Transfer.

*c) Cross River Fails to Follow the Instructions and Directions Given by Harborview*

50.     As noted above, at the time Harborview opened its Account at Cross River,

Harborview had completed an Account Opening Data Entry Form provided by Cross River ("Account Form"). See **Exhibit "B".**

51.     The Account Form clearly stated that no foreign wire activity was authorized, and that no business would be conducted of a foreign nature.

52.     The aforesaid opening data entry form was not the first notification by Harborview to Cross River that Harborview did not engage in foreign wire activity. In 2015, when opening its operating account, Harborview advised Cross River in writing that Harborview did not conduct foreign wire activity, that the same was not authorized, and that no business would be conducted by Harborview of a foreign nature.  See **Exhibit "A"**.

53.     All four fraudulent Wire Transfers were processed in bad faith from Cross River to Hang Seng Bank, a foreign bank. The three successful Wire Transfers were deposited into accounts at Hang Seng Bank.

54.     The accounts at Hang Seng Bank were maintained by account holders that Harborview had never previously heard of; had no contact with; had never done business with; had never transferred any money to; and were not in any way associated with Harborview.

55.     The Wire Transfers set forth above were not authorized by Harborview and were the product of fraud.

56.     The loss of $1,375,000.00 by Harborview would not have occurred but for the bad faith Cross River displayed in ignoring the explicit instructions and directions of Harborview.

*d) Cross River Fails to Obtain Proper Authority from Plaintiff for the International Wire Transfers*

57.     Despite the fact that Harborview had made 1,171 wire transfers – WITH ALL OF THE SAME BEING DOMESTIC IN NATURE – and despite the above express

8

instructions and directions of Harborview that its accounts would be used for domestic wires only, Cross River treated the Wire Transfers like domestic wire transfers as opposed to international wire transfers.

58. At no point did Cross River obtain direct verbal authority from the President or Managing Director of Harborview to process the Wire Transfers.

59. Given that the Wire Transfers were international wire transfers as opposed to domestic wire transfers, Harborview's prior instructions and directions, and Harborview's established banking patterns, Cross River should have contacted the President and CEO and/or the Managing Director of Harborview to verbally confirm the authenticity of these Wire Transfers.

60. Further, given that CEO Fraud was well known in the banking industry, and given the fact that all of Harborview's prior wires were done domestically and that the Wire Transfers in question were going to Hang Seng Bank located in Hong Kong, Cross River should have contacted the President and CEO and/or the Managing Director of Harborview to verbally confirm the authenticity of these Wire Transfers.

61. Cross River exhibited bad faith and lack of knowledge of Harborview in failing to directly contact the President and CEO and/or the Managing Director of Harborview to verbally confirm the authenticities of the wires.

62. Additionally, Cross River failed to make two distinct contacts within Harborview to verify the authenticity of the subject Wire Transfers. This evidenced security practices that were commercially unreasonable.

63. Given the foreign wire request and given that Cross River was aware that Ephraim Kutner traveled throughout the United States on a very regular basis and was most

often not found at the business offices of Harborview, Cross River should have directly contacted **two** authorized signatories at Harborview to verbally verify the authenticity of the Wire Transfer requests, or the lack thereof. Instead, Cross River made only one such direct communication at Harborview.

64.     The loss of $1,375,000.00 by Harborview would not have occurred but for Cross River's failure to verbally contact the President and CEO and/or the Managing Director of Harborview regarding the Wire Transfers.

*e) Cross River Failed to Follow Commercially Reasonable Banking Practices and its Own Security Measures to Prevent CEO Fraud*

65.     Since Cross River processed the unauthorized and fraudulent Wire Transfers, $1,375,000.00 belonging to Harborview was transferred to unauthorized third parties.

66.      Cross River had an obligation to know its customer and was aware or should have made it aware that Harborview did not conduct business with the account holders at Hang Seng Bank in Hong Kong.

67.     By 2018 when the fraudulent Wire Transfers were processed by Cross River, this type of wire fraud was well-known in financial circles as the "Business Executive Scam" or the "CEO Fraud."[3] The FBI described the scam as follows:

> The e-mail accounts of high-level business executives (CFO, CTO, etc) are compromised. The account may be spoofed or hacked. A request for a wire transfer from the compromised account is made to a second employee within the company who is normally responsible for processing these requests.

68.     As early as 2015, the FBI reported that "the majority of the [fraudulent]

---

[3] See, Federal Bureau of Investigations Internet Crime Complaint Center. (2016). *Business email compromise: The 3.1 billion dollar scam.* Retrieved from: http://www.ic3.gov/media/2016/160614.aspx. See also, Ensign, Rachel Louise. (23 Feb 2020). *Losing $450,000 in Three Days: Hackers Trick Victims into Big Wire Transfers;* Wall Street Journal (Online); New York, N.Y.

transfers" in CEO Fraud and other Business Email Compromise cases, were "going to Asian banks located within China and Hong Kong."[4]

69.      On July 12, 2018, the FBI reported that the real estate industry was a particular target of Business Email Compromise schemes.[5]

70.      Despite the industry knowledge of the way CEO Fraud schemes work, and the particular vulnerability of companies in the real estate sector, Cross River failed to set up appropriate heightened security procedures to catch potential CEO Fraud/Business Email Compromise.

71.      As a result, in an act of bad faith and in breach of commercially reasonable security procedures, Cross River processed the fraudulent Wire Transfers though they reeked of known fraud: (1) they originated from Harborview's Account Manager, the "employee within the company who is normally responsible for processing these requests"; (2) the CEO of Harborview was known to travel frequently, as is typical in CEO Fraud cases; (3) the wires were directed to a bank in Hong Kong, one of two countries known since at least 2015 to receive the large majority of fraudulent CEO Fraud wires; and (4) Harborview, a real estate company particularly vulnerable to CEO Fraud, had never previously wired ANY funds internationally.

72.      Worse, the one step Cross River ostensibly took to confirm the authenticity of the wires played right into the hacker's plan – Cross River called the "second employee"

---

[4]   See, Federal Bureau of Investigations Internet Crime Complaint Center. (2015). *Business email compromise public service announcement*. Retrieved from: https://www.ic3.gov/media/2015/150827-1.aspx.

[5]   See, Federal Bureau of Investigations Internet Crime Complaint Center. (2018). *Business E-Mail Compromise The 12 Billion Dollar Scam.* Retrieved from https://www.ic3.gov/media/2018/180712.aspx.

described by the FBI in paragraph 67, the very employee who had received the fraudulent wire requests from the CEO's compromised account.

73.     Cross River displayed bad faith and commercially unreasonable security procedures when it failed to safeguard against the well-known CEO Fraud when setting up its security and confirmation procedures; industry knowledge of how CEO Fraud works should have informed the development of commercially reasonable security procedures. At the very least, Cross River's security procedures should have required authentication of the wires beyond a single call to the very employee who was or could have been the "second employee" in a CEO Fraud case.

74.     The actions of Cross River, as set forth above, violated acceptable and reasonable banking practices and procedures. As such, Cross River's actions were not taken in good faith and were not commercially reasonable.

75.     Further, upon information and belief, Cross River failed to follow its own security procedures.

76.     As noted above, Cross River continues to refuse to provide Harborview with a copy of the security procedures in place at the time of the relevant Wire Transfers.

77.     Cross River's refusal to provide Harborview with its security procedures is contrary to standard banking practice and, upon information and belief, a violation of Cross River's own practices and procedures.

78.     Further, upon information and belief, Cross River's refusal to provide Harborview with Cross River's security procedures suggests that Cross River violated its own procedures, and that Cross River violated standard banking practice and commercially reasonable banking standards.

79. Lastly, upon information and belief, since the events described in this Complaint, Cross River enacted new and revised policies and/or procedures to prevent the recurrence of the errors it made in this case. Cross River's actions effectively acknowledge the inadequacy of its former procedures as well as the feasibility of simple precautionary measures that it failed to implement previously.

80. The loss of $1,375,000.00 by Harborview would not have occurred but for Cross River's bad faith in processing the wires in violation of standard banking practice, and but for Cross River's failure to establish and/or adhere to commercially reasonable security standards.

*f) Cross River Failed to Recover the Improperly Wired Funds*

81. The Wire Transfer funds were received at Hang Seng Bank by various account holders.

82. Such account holders maintained their bank account at Hang Seng Bank, which is an affiliate bank of HSBC, and principal member of the HSBC Group.

83. After the funds were fraudulently wired to the account holders at the HSBC affiliate, Cross River continued to act negligently and in bad faith by failing to demand that the HSBC affiliate return to its customer (Harborview) the Wire Transfer funds that were improperly processed by Cross River.

84. Further, Cross River learned that the account holders in Hang Seng Bank – the recipients of the fraudulent Wire Transfers – maintained numerous accounts in Hang Seng Bank, an affiliate of HSBC. Yet, Cross River failed to take reasonable steps and measures to recover the funds from the HSBC affiliate.

85. Cross River failed to act in good faith and in compliance with commercially reasonable security procedures when processing the Wires and failed to take reasonable steps and measures to recover the Wire Transfers once they were improperly processed, which

constitutes gross negligence and carelessness on behalf of Cross River.

## COUNT I

### (Violation of N.J.S.A. 12A:4A-201, 12A:4A-202 and 12A:4A-203)

86.     Plaintiff incorporates the allegations of paragraphs 1-85 as if more fully set forth herein.

87.     N.J.S.A. §§ 12A:4A-201, -202 and -203 govern the issuance and acceptance of payment orders by a bank.

88.     N.J.S.A § 12A:4A-201 sets out the definition of a "security procedure."

89.     Pursuant to N.J.S.A. § 12A:4A-202(1), "A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency."

90.     Pursuant to N.J.S.A. § 12A:4A-202(2):

> If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the **security procedure is a commercially reasonable method of providing security against unauthorized payment orders**, and (ii) the bank proves that it **accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer** restricting acceptance of payment orders issued in the name of the customer. [Emphasis added.]

91.     Pursuant to N.J.S.A. § 12A:4A-202(2), Cross River had a duty to establish commercially reasonable security procedures regarding wire transfers.

92.     Cross River further had a duty to safeguard the monies of Harborview through establishing and following commercially reasonable security procedures.

93.     Cross River further had a duty to safeguard against known hacking schemes affecting the banking industry through establishing and following commercially reasonable

security procedures.

94.     Pursuant to N.J.S.A. § 12A:4A-202(2), Cross River also had a duty to accept the payment order only if it could do so in good faith and in compliance with the security procedure and any written agreement or instruction of Harborview.

95.     Cross River had a duty to know its customer, follow the wire transfer instructions provided by Harborview when they initially opened their accounts, and the pattern of behavior that Harborview established following said openings.

96.     As set forth in all preceding paragraphs herein, Cross River violated the provisions of N.J.S.A. § 12A:4A-202(2) by accepting unauthorized Wire Transfer orders in connection with the Account.

97.     As set forth in all preceding paragraphs herein, Cross River violated the provisions of N.J.S.A. § 12A:4A-202(2) by failing to maintain and/or adhere to a commercially reasonable security procedure.

98.     As set forth in all preceding paragraphs herein, Cross River violated the provisions of N.J.S.A. § 12A:4A-202(2) by failing to maintain and/or adhere to a commercially reasonable security procedure, which failure led directly to the theft of $1,375,000.00 from Harborview's Account by unauthorized transfers, of which Harborview informed Cross River immediately upon discovery of said unauthorized transfers.

99.     In addition, as set forth in all preceding paragraphs herein, because Cross River, at a minimum, (i) failed to verbally confirm authorization for the transfers with the President and CEO and/or the Managing Director of Harborview, (ii) failed to obtain two verbal confirmations, to apply its extensive knowledge of Harborview's banking patterns and practices, (iii) failed to follow Harborview's written instructions, and (iv) failed to account for

15

known CEO Fraud schemes in its security procedures, Cross River failed to accept the wire transfer requests in good faith.

100.    Accordingly, pursuant to N.J.S.A. § 12A:4A-203, the wire transfers were unenforceable. Nevertheless, Cross River effectuated the transfers.

101.    N.J.S.A. § 12A:4A-204 states that if:

> (1) a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer under section 12A:4A-202, or (ii) not enforceable, in whole or in part, against the customer under section 12A:4A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

102.    Given the foregoing, pursuant to N.J.S.A. § 12A:4A-204, Cross River is liable for its payment of unenforceable transfers, and thus must refund to Harborview the $1,375,000.00 stolen by way of the fraudulent transfers together with interest at the highest rate allowed by law from August 27, 2018, and court costs.

WHEREFORE, Plaintiff, Harborview Capital Partners, LLC prays for judgment against Defendant Cross River Bank in Count I of its Complaint in the principal sum of $1,375,000.00, together with interest at the highest rate allowed by law from August 27, 2018, court costs and for such other and further relief as this Court deems just and proper.

## COUNT II

### (Negligent Misrepresentation)

103.    Plaintiff incorporates the allegations of paragraphs 1-102 above as if more fully set forth herein.

104.    In 2013, Gade and Kutner discussed Harborview, a new business that Kutner had formed.  Gade requested that Kutner deposit into Cross River certain funds belonging to

Harborview. Cross River made this request of Harborview to help Cross River establish itself financially and grow its modest base of assets/deposits.

105.    After receiving Cross River's request for deposits, Harborview expressed concern regarding the safety of its monies that Harborview was requested to deposit into Cross River.

106.    In response to Harborview's concerns, Cross River assured Harborview that Harborview's money would be secure at Cross River. Cross River represented to Harborview that Cross River maintained and followed first-rate security policies and procedures, and that Harborview's deposits would always remain safe and secure at Cross River.

107.    In reliance thereon, Harborview began depositing funds at Cross River. Such deposits ultimately totaled the sum of $20,000,000.00, within various accounts at Cross River.

108.    When Harborview deposited $6,800,000.00 into a savings account at Cross River on or about January 17, 2018, Harborview justifiably relied on the aforesaid representations of Cross River that Cross River maintained and followed first-rate security policies and procedures, and that Harborview's deposits would always remain safe and secure at Cross River.

109.    But for said representations, Harborview would never have opened any bank accounts at Cross River.

110.    But for said representations, Harborview would never have deposited the aforesaid $6,800,000.00 into Cross River.

111.     But for said representations, there would not have been a banking relationship between Harborview and Cross River.

112.    Such representations were false and negligently made as Cross River did not

maintain and follow first-rate security policies and procedures and Harborview's monies did not remain safe and secure at Cross River.

113.     Specifically, as aforesaid, Cross River failed to follow the multiple written instructions issued by Harborview pertaining to domestic wires ONLY, failed to implement and follow first rate security measures to prevent against the CEO Fraud/Business Email Compromise scheme that occurred herein, failed to timely advise as to fraudulent account activity, failed to timely investigate fraudulent activity, failed to timely recover fraudulently transferred wire funds in the amount of $1,375,000.00 and failed to verify the subject wire requests with two distinct and independent contacts with its customer Harborview.

114.     Further, by providing the Account Opening Data Entry Forms to Harborview and requiring its completion, Cross River represented to Harborview that it would read and follow the information provided by Harborview on the form in the safekeeping of Harborview's funds and that it would properly advise its employees and agents as to the information and instructions provided by Harborview.

115.     In reliance thereon, Harborview deposited funds totaling $6,800,000.00 into Cross River on or about January 17, 2018.

116.     But for Cross River's representation that it would read and follow the information provided by Harborview on Cross River's own forms and instruct all employees and agents as to the information provided, Harborview would never have deposited $6,800,000.00 into Cross River on or about January 17, 2018.

117.     Such representations were false and negligently made as Cross River did not read and follow the information provided by Harborview on the Account Opening Data Entry Form, and Cross River did not code Harborview's account within the wire room to only process

domestic wires; Cross River processed foreign wires even though Harborview specifically stated on the Account Opening Data Entry Form that it only conducts business domestically and that any wires would be domestic.

118.    As a result of its reliance on Cross River's representations, Harborview has been damaged in the amount of $1,375,000.00, which is the amount of the Wire Transfer funds that were improperly processed by Cross River.

WHEREFORE, Plaintiff, Harborview Capital Partners, LLC prays for judgment against Defendant, Cross River Bank, in Count II of its Complaint in the principal sum of $1,375,000.00, together with interest at the highest rate allowed by law from August 27, 2018, costs and for such other and further relief as this court deems just and proper.

<u>**COUNT III**</u>

**(Breach of Contract)**

119.    Plaintiff incorporates the allegations in 1-118 above as if more fully set forth herein.

120.     By virtue of the account opening documents, including the Account Opening Data Entry Forms, provided by Cross River to Harborview to complete and sign in connection with opening its account at Cross River, Cross River assumed certain contractual duties to Harborview.

121.    Pursuant to Cross River's account opening documents, it agreed to handle the funds it maintained in Harborview's account in accordance with certain policies and procedures.  Specifically, pursuant to the Account Opening Data Entry Forms, Cross River agreed that it and its employees would follow the information and instructions provided by Harborview on the form in the safekeeping of Harborview's funds.

122.    As described at length above, the Account Opening Data Entry Forms executed by Harborview unambiguously stated that Harborview only conducts business domestically and that any wires to be made by Harborview would be domestic in nature.

123.    Notwithstanding Harborview's express instructions as set for the in the Account Opening Data Entry Form governing Harborview's account, Cross River processed foreign wires from Harborview's account, thereby breaching the terms of its agreement with Harborview, including that contained in the Account Opening Data Entry Form.

124.    As a direct and proximate result of Cross River's breach of the terms of the Account Opening Data Entry Form, Harborview has sustained damages in the amount of $1,375,000.00, which is the amount of the Wire Transfer funds that were improperly processed by Cross River.

WHEREFORE, Plaintiff, Harborview Capital Partners, LLC prays for judgment against Defendant Cross River Bank in Count III of its Complaint in the principal sum of $1,375,000.00, together with interest at the highest rate allowed by law from August 27, 2018, court costs and for such further relief as this Court deems just and proper.

## COUNT IV

### (Promissory Estoppel)

125.    Plaintiff incorporates the allegations of paragraphs 1-124 above as if more fully set forth herein.

126.    As described above, prior to the formation of a banking relationship between Cross River and Harborview, Cross River, through its founder Gade, represented to Harborview that Harborview's funds would be secure at Cross River in response to Harborview's concerns regarding the safety of any funds deposited with Cross River.

Specifically, Cross River promised, among other things, that Cross River maintained first-rate security policies and procedures and that it would handle Harborview's funds in accordance with those policies and procedures.

127.    Cross River expected and intended that Harborview would rely on these promises in connection with its effort to induce Harborview to deposit funds with Cross River. Harborview reasonably relied on Cross River's promises that Cross River maintained first-rate security policies and procedures when it deposited funds totaling $20,000,000.00 into various accounts at Cross River.

128.    As described herein, Harborview reasonably relied on Cross River's promises to Harborview's detriment.  Cross River failed to follow the multiple written instructions issued by Harborview pertaining to domestic wires ONLY, failed to implement and follow first-rate security measures to prevent against the CEO/Fraud/Business Email Compromise scheme that occurred herein, failed to timely advise as to fraudulent account activity, failed to timely investigate fraudulent activity, failed to timely recover fraudulently transferred wire funds in the amount of $1,375,000.00 and failed to verify the subject wire requests with two distinct and independent contacts with its client, Harborview.

129.    As described herein, at all times, Harborview's reliance on Cross River's promises and representations was reasonable and justifiable.

130.    As a direct and proximate result of the foregoing, Harborview has sustained damages in the amount of $1,375,000.00, which is the amount of the Wire Transfer funds that were improperly processed by Cross River.

WHEREFORE, Plaintiff, Harborview Capital Partners, LLC prays for judgment against Defendant Cross River Bank in Count IV of its Complaint in the principal sum of

$1,375,000.00, together with interest at the highest rate allowed by law from August 27, 2018, court costs and for such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury of all claims and defenses in this action so triable.

CHIESA SHAHINIAN & GIANTOMASI PC

By: /s/A. Ross Pearlson
A. Ross Pearlson, Esq.
Brigitte M. Gladis, Esq.
One Boland Drive
West Orange, NJ  07052
Telephone:  973.325.1500
Facsimile:   973.325.1501

FRANKEL, RUBIN, KLEIN, PAYNE
 & PUDLOWSKI, P.C.
Mayer S. Klein, Esq.
(*pro hac vice* application forthcoming)
231 S. Bemiston Avenue
Suite 1111
Clayton, MO 63105
Telephone: 314.725.8000
Facsimile:  314.726.5837

*Attorneys for Plaintiff*
*Harborview Capital Partners, LLC*

## <u>LOCAL RULE 11.2 CERTIFICATION</u>

I certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding; no other action, arbitration or administrative proceeding is contemplated to my knowledge; and I know of no other parties who should be joined in this action at this time.

CHIESA SHAHINIAN & GIANTOMASI PC

By: *<u>/s/A. Ross Pearlson</u>*
    A. Ross Pearlson, Esq.
    Brigitte M. Gladis, Esq.
    One Boland Drive
    West Orange, NJ  07052
    Telephone:  973.325.1500
    Facsimile:  973.325.1501

FRANKEL, RUBIN, KLEIN, PAYNE
 & PUDLOWSKI, P.C.
Mayer S. Klein, Esq.
(*pro hac vice* application forthcoming)
231 S. Bemiston Avenue
Suite 1111
Clayton, MO 63105
Telephone: 314.725.8000
Facsimile:  314.726.5837

*Attorneys for Plaintiff*
*Harborview Capital Partners, LLC*