# KAUFMAN DOLOWICH
### Attorneys at Law

**Kaufman Dolowich LLP**
25 Main Street, Suite 500
Hackensack, New Jersey 07601

Telephone: 201.488.6655
Facsimile: 201.488.6652

KaufmanDolowich.com

*Iram P. Valentin, Esq.*
*Partner*

*Certified by the Supreme Court*
*Of New Jersey as a Civil Trial Attorney*

*Direct E-mail: ivalentin@kdvlaw.com*
*Direct Dial: 201-708-8233*

May 17, 2024

**VIA ECF**
Honorable James B. Clark, III, U.S.M.J.
United States District Court, District of New Jersey
Martin Luther King Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

> Re: **Harborview Capital Partners, LLC v. Cross River Bank;**
> **Civil Action No.: 21-cv-15146-EP-JBC**

Dear Judge Clark:

We represent Defendant Cross River Bank ("Cross River"). Pursuant to Your Honor's Order entered May 14, 2024 [ECF No. 116], we write in response to the letter filed by Plaintiff Harborview Capital Partners LLC ("Harborview") [ECF No. 115] on May 13, 2024, requesting leave to file a motion to compel to (1) require the production of allegedly withheld documents and/or (2) issue a sanction barring Cross River from later producing or presenting evidence to contradict a requested "negative inference" if it does not make a further production now. For the following reasons, Harborview's arguments lack merit.

### I. Preliminary Statement

This case is simple. Harborview sued Cross River in connection with four (4) international wire transfers **initiated and authorized** by Harborview's employee, Marilyn Tirado, an agent and authorized signatory on Harborview's accounts held at Cross River. Specifically, Ms. Tirado requested that these international wire transfers be made when a hacker ostensibly penetrated *Plaintiff's* computer system, sent her numerous emails from the account of Plaintiff's CEO, Ephraim Kutner, and directed her to make the subject transfers, which she believed were directed by Mr. Kutner. Prior to processing the transfer requests, which were not only signed by Ms. Tirado,

*but by Mr. Kutner himself*, Cross River called her to verify the transactions – which were readily verified, all four times.

Harborview's legal claims are premised on Cross River's supposed violations of the UCC, as adopted by New Jersey. Despite Harborview's rhetoric, this case begins and ends with authorization. In particular, *N.J.S.A.* 12A:4A2-202(1), and the authority interpreting this statutory provision, is clear: if a customer of a financial institution authorizes a transfer, the financial institution bears no liability if the customer fell victim to fraud. If, however, the transfer was unauthorized, the analysis then turns on the question of whether or not the financial institution had commercially reasonable means of security to verify the transfers.

The Honorable Kevin McNulty, U.S.D.J. concluded **three times** that, on their face, the wire transfers were authorized; first, in the Court's Order and Opinion on Cross River's Motion to Dismiss the initial Complaint; second, in the Court's Order and Opinion on Harborview's Motion to Reconsider; and, third, in the Court's Order and Opinion on Cross River's Motion for Summary Judgment. However, in the Order on Summary Judgment, Judge McNulty granted Harborview's request for additional discovery "under the supervision of the Magistrate Judge, who will ensure that such discovery is limited to the issues that remain concerning the authority of Harborview's employee, the scope of Cross River's knowledge regarding that authority, and the commercial reasonableness of its procedures to verify the authenticity of the wire transfer[s]."

Discovery in this matter is, unquestionably, limited to these disputed issues. However, and despite this clear directive from Judge McNulty, Harborview has continued to engage in a relentless and taxing fishing expedition in order to manufacture a claim and evade eventual dismissal. Cross River identifies and discusses this pattern in its pending Motion for Protective Order [ECF No. 114], and the same rationale applies here, as Harborview presses Cross River for ostensible documents that either do not exist or are completely irrelevant to the issues in this action. For the reasons set forth below, this should not be permitted. *See Claude P. Bamberger Intern., Inc. v. Rohm and Haas Co.*, 1998 WL 684263 at *2 (internal citations omitted) ("[D]iscovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it; the plaintiff must have some basis in fact for the action….the discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable without discovery, not to find out if it has any basis for its claim. That the discovery might uncover evidence showing that a plaintiff has a legitimate claim does not justify the discovery request….").

II.     **Harborview's "Post-Deposition Requests" Were Responded To; They Request Information That Is Either New, Duplicative, Redundant, And/or Non-Existent.**

On March 18, 2024 – after Harborview deposed four (4) Cross River fact witnesses it noticed over the course of three (3) days – Cross River responded to Harborview's Post-Deposition Request for Production of Documents ("Post-Deposition Requests") (Exhibit 1). Contrary to Harborview's position, many of the requests were new (i.e., a request for the resume of Kathleen Nelson, Cross River's Chief Operating Officer), duplicative of previously served requests (i.e., a request for communications between Cross River and Hang Seng Bank, Hong Kong officials, or any other person or entity approached in Hong Kong related to the wire transfers) and/or requested

2

information that simply did not exist (i.e., a request for any information provided by an internal system called "World Check" or notes about information in "World Check" relative to the four international wires). Accordingly, Cross River interposed appropriate objections to certain requests (*see Graber v. Dales*, 511 F.Supp.3d 594, 600 (E.D.Pa. 2021) ("discovery remains limited as to what is necessary to determine the issue of qualified immunity, and *Defendant may challenge any discovery request as provided by the Federal Rules of Civil Procedure*") (emphasis added); at the same time, Cross River produced one hundred and fifty (150) pages of non-privileged documents responsive to the Post-Deposition Requests.

### III.     Harborview's "Discovery Deficiency" Letter Is Disingenuous and Objectionable.

Almost a month and a half after Cross River served these responses and objections to Harborview's Post-Deposition Requests, it received Harborview's May 2, 2024 "discovery deficiency" letter. This letter identifies purported deficiencies with Cross River's latest production, to which Cross River responds in turn in compliance with the Court's directive.

1. *Cross River's Written Objections*

Harborview ostensibly takes issue with (1) Cross River's objection to the use of the phrase "suspicious wires"; and (2) Cross River's objection to certain requests as duplicative.

With regard to the "suspicious wires" objection, Cross River, in its Responses and Objections to Harborview's Post-Deposition Document Requests, placed the following objection when the term "suspicious wires" was used in a Request: "Defendant [] objects to this demand to the extent that the term 'suspicious wires' implies that Defendant deemed the four international wire transfers to be 'suspicious,' which is not supported by the record." The nature of the wires is frankly not in issue. Despite Harborview's unilateral interpretation of the record to date, Cross River is under no obligation to accept Harborview's characterization of the four international wire transfers. Cross River did not deem the wire transactions to be suspicious, particularly because both Ms. Tirado and Mr. Kutner authorized them verbally and in writing. Therefore, Cross River respectfully submits that its objection is proper. Notwithstanding the objection, Cross River has not withheld any documents from production pursuant to this objection.

Cross River's objection to duplicative requests is also proper. In response to such Requests, Cross River referred to or provided the same documents and information that it had provided in previous Requests, thereby proving the duplicative nature. However, again, Cross River has not withheld any documents from production pursuant to this objection. This issue is, therefore, moot.

2. *OFAC Related Materials*

Harborview's next gripe is with Cross River's response to Post-Deposition Request No. 5, which states: "Ms. Kim testified she was shown a .ppt during her training the (sp) indicated how she was trained on identifying OFAC false positives. Pursuant to our previous request 37 and 39 (among others), please supplement your production immediately. NB: We acknowledge your

production of IT trainings from 911-1204, but no information in these presentations seems to be related to OFAC policies."

In response to this Request, Cross River produced the two PowerPoints that Ms. Kim referred to her in deposition, without objection. However, in its May 2 letter, Harborview asks, *for the first time*, for *additional* documentation, including "internal training/follow-up emails/memos, or actions taken by Cross River with regard to this training as well as any certifications of attendance from this training PowerPoint should it be Cross River's position that indeed this PowerPoint represents the training of its staff." Remarkably, Harborview posits this request as if Cross River purposefully withheld documents that Harborview initially requested, which could not be further from the truth. Indeed, Cross River fulfilled Harborview's *singular* request for the OFAC training PowerPoints, and it should not have an obligation to provide anything further. Indeed, Document Request No. 37 referenced by Harborview (quite overbroadly) requests "any and all documents or communications that relate to Cross River's legal *"know your customer" (KYC) obligations* and Harborview or the Unauthorized Wires," and Document Request No. 39 requests "any and all documents that *describe* Cross River's wire room procedures, including but not limited to, operating and security procedures." (Emphasis added.) Harborview's additional document demands have nothing to do with these Requests or implementation of these policies or the OFAC policy (*see, e.g.,* Harborview's ambiguous and bizarre request for "follow-up or after-the-fact review that Cross River conducted after being trained in 2020 that China was posing a threat, in 2019, if any"). Cross River should not be required to search for or produce irrelevant documents.

Harborview further complains about Cross River's alleged failure to produce "memo notes" relative to the OFAC check for each of the four international wires. In particular, Harborview alleges that documentation only containing the description "False Positive" has been produced in various productions, when more information concerning the OFAC check should have been available.[1] Harborview's assertion is incorrect. Numerous documents produced by Cross River contains the "Audit Trail" for each wire transfer; and this "Audit Trail" further contains a row called "OFAC Approved," which provides the reason for why the wire was released after an OFAC review was conducted. Indeed, Harborview's counsel is well aware of the existence of the Audit Trail – in fact, at the deposition of Anna Kim, Cross River's former Wire Transfer Manager, counsel specifically tells Ms. Kim that he is "going to walk through the audit trail information with [her]." (Exhibit 2).

---

[1] Harborview attempts to confuse the Court or by contradicting the record and stating in its May 13 letter, at page 3, that "[h]ad Cross River followed its own internal policies related to what it should have done when an OFAC positive came through, it is likely that at least three, if not all four, of the suspicious wires would have been stopped." This completely misconstrues the testimony of the Cross River deponents. All four wire transfers were noted as "false positives," and as reflected by the deposition testimony and the documents that Cross River produced, the proper procedures for reviewing OFAC-flagged transactions were followed to the tee.

3. *World Check Procedures*

Harborview requests the effective date of the first version of Cross River's "World Check Procedures." That date is November 2018.

4. *Suspicious Activity Report and Related Information*

Harborview finally requests "information, memos, or documentation….with regard to whether [Cross River's] BSA/AML officer was made aware of" the four international wire transfers. Again, Harborview's position here assumes that the four international wires needed to be reported to Cross River's BSA/AML team and, if not, some negative inference should be drawn that Cross River did not comply with its own policies. In fact, as made clear by Ms. Kim's deposition testimony, Cross River's policies did *not* require that a single one of the four wires be reported to the BSA/AML team (e.g., when Ms. Kim was asked, "When you make a decision as to the OFAC scan hit being a false positive do you communicate that with the OFAC compliance officer?", she stated "No.") (Exhibit 3). Moreover, the "incident report" referenced by Ms. Nelson at her deposition and in the May 2 letter has already been produced, at CRB001358-CRB001492. In sum, Cross River produced all non-privileged/non-confidential documents and information that are responsive to Harborview's queries relative to Cross River's BSA/AML policies, and that team's involvement with the wire transfers.

## IV. Conclusion

In light of the above, there should be no doubt that Cross River satisfied its written discovery obligations to Harborview. Harborview's requests for more documents and more information is contrary to Judge McNulty's directive for *limited* discovery, and they are nothing but an attempt to manufacture a case in an attempt to avoid the unavoidable, as all subject international wire transactions were approved by not one, but two of Harborview's authorized agents, including approval by an authorized signatory and also by its CEO – which, as a matter of law, should end this action.

Accordingly, Cross River respectfully requests that the Court deny Harborview's request for leave to file a motion to compel.

                                         Respectfully submitted,
                                         **Kaufman Dolowich, LLP**

                                         By: */s/ Iram P. Valentin*
                                              IRAM P. VALENTIN
                                              ALLISON R. SCOTT

IPV/ars
Encl.
Cc:    All counsel of record (via ECF)

# EXHIBIT 1

**KAUFMAN DOLOWICH, LLP**
Iram P. Valentin, Esq. (Attorney No. 010222002)
Allison R. Scott, Esq. (Attorney No. 083842013)
25 Main Street, Suite 500
Hackensack, New Jersey 07601
Tel: (201) 488-6655
Fax: (201) 488-6652
*Attorneys for Defendant, Cross River Bank*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HARBORVIEW CAPITAL PARTNERS, LLC<br><br>          Plaintiff,<br>vs.<br><br>CROSS RIVER BANK,<br><br>          Defendant. | Civil Action: 2:21-cv-15146-KM-ESK<br><br>**DEFENDANT CROSS RIVER BANK'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S POST-DEPOSITION REQUEST FOR PRODUCTION OF DOCUMENTS** |

TO:    **CHIESA SHAHINIAN & GIANTOMASI PC**
        A. Ross Pearlson, Esq.
        Brigitte M. Gladis, Esq.
        105 Eisenhower Parkway
        Roseland, NJ 07068

        **FRANKEL, RUBIN, KLEIN, PAYNE & PUDLOWSKI, P.C.**
        Mayer S. Klein, Esq.
        231 South Bemiston Avenue, Suite 1111
        Clayton, MO 63105

Pursuant to the Federal Rules of Civil Procedure, Defendant, Cross River Bank ("Defendant"), by and through its attorneys, Kaufman Dolowich, LLP, hereby submits the following responses and objections to Plaintiff Harborview Capital Partners, LLC's ("Plaintiff's") Post-Deposition Request for Production of Documents ("Requests").

DATED: March 18, 2024                    **KAUFMAN DOLOWICH, LLP**

                                         _____
                                         **IRAM P. VALENTIN, ESQ.**

## **PRELIMINARY STATEMENT**

Nothing stated herein shall be construed as an admission by Defendant respecting the admissibility or relevance of any fact or document or as an admission of the truth or accuracy of any characterization of any document of any kind contained in the Plaintiff's requests for production.

These responses are based upon the information available at the present time from Defendant. Defendant will continue to review its files and reserves the right to supplement, amend or correct these responses in the event that future discovery reveals facts that will justify such supplementation, amendment or correction.

By making information or documents available in response to the Plaintiff's requests for production, Defendant does not waive or intend to waive any objections which it may have to the Plaintiff's use of these documents and expressly reserves all questions concerning competency, privilege, relevancy, materiality and admissibility of all responses to the requests for production and documents produced and their contents; the right to object to the Plaintiff's use of these responses and to produce documents in whole or in part, or to the subject matter covered thereby at a later stage of proceedings on any grounds set forth hereinabove; and, the right to object on any and all proper legal grounds at any time to discovery procedures involved in or relating to the subject matter of the demand responses or documents made available to the parties.

## DEFENDANT CROSS RIVER BANK'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S POST-DEPOSITION REQUEST FOR PRODUCTION OF DOCUMENTS

1. A copy of a recent resume from Kathy Nelson, and/or a cv if available.

   **RESPONSE:** Upon advice of counsel, objection. This document demand is irrelevant to the subject matter of the within action. Subject to and without waiver of the foregoing objections, see the documents produced at CRB001685-CRB001686. Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

2. Any notes made by any employee of Cross River or any automated notices provided by the WatchDog software related to the OFAC "possible hit" or related to the verifications and follow-ups for each of the four suspicious wires.

   **RESPONSE:** Upon advice of counsel, objection. This document demand is vague and ambiguous. Defendant further objects to this demand to the extent that the term "suspicious wires" implies that Defendant deemed the four international wire transfers to be "suspicious," which is not supported by the record. .

   Subject to and without waiver of the foregoing objections, see the documents produced at CRB001677-CRB001684. Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

3. Any communications made between Cross River and Hang Seng Bank, Hong Kong officials, or any other person or entity approached in Hong Kong related to the suspicious wires.

   **RESPONSE:** Upon advice of counsel, objection. This document demand is overly broad, unduly burdensome, vague and ambiguous. Defendant further objects to this demand to the extent that the term "suspicious wires" implies that Defendant deemed the four international wire transfers to be "suspicious," which is not supported by the record. Defendant further objects to this demand to the extent that it is duplicative of other Requests, namely, Request No. 22 of Plaintiff's First Request for Production of Documents ("[a]ny and all documents and communications with Heng Seng Bank regarding or related to the Unauthorized Wires").

   Subject to and without waiver of the foregoing objections, no documents exist which are responsive to this Request. However, after Plaintiff notified Defendant that the four international wire transfers authorized by Marilyn Tirado were the result of an attack on *Plaintiff's* email systems, Defendant sent and received a number of service messages to JPMorganChase – the correspondent bank – requesting a recall of the three authorized international wires. These messages were previously produced at CRB001523-CRB001534. Additional copies of the service message correspondence with JPMorganChase is attached hereto at CRB001688-CRB001713. Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

4. Although Ms. Nelson testified a SAR was not completed before stating she would not have seen one, a copy of the SAR if it was indeed one was completed.

   **RESPONSE:** Upon advice of counsel, objection. This document demand is overly broad, unduly burdensome and duplicative of Request No. 36 of Plaintiff's First Request for Production of Documents ("[a]ny and all Suspicious Activity Reports Cross River generated or completed that relate to Harborview or the Unauthorized Wires.") Defendant further objects to the extent that Suspicious Activity Reports ("SARs") are prohibited from disclosure pursuant to applicable federal and/or state law, regulations and guidance, including, but not limited to, 31 CFR 1020.320(e) and FinCEN Advisory FIN-2012-A002, 3/2/2012. To make a formal request for a SAR, Plaintiff must submit a formal document request to bsadocumentrequests@crossriver.com, or submit a subpoena to Defendant's legal department.

   Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

5. Ms. Kim testified she was shown a .ppt during her training the (sp) indicated how she was trained on identifying OFAC false positives. Pursuant to our previous request 37 and 39 (among others), please supplement your production immediately. NB: We acknowledge your production of IT trainings from 911-1204, but no information in these presentations seems to be related to OFAC policies.

   **RESPONSE:** Please see documents produced at CRB001714-CRB001753.

   Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

6. Ms. Kim testified during her deposition that the cross-river wire room may have kept internal policies and practices outside of deposition exhibit G-1 (CRB 216-223), such as a prior version of the document provided by CRB 1535 (Ex. Z). Ms. Kim referred to it as potentially "Wire entry procedures". Pursuant to our previous request 39 (among others), please supplement your production immediately.

   **RESPONSE:** Please see documents produced at CRB001761-CRB001796.

   Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

7. Ms. Gamero testified that the Account Opening Data Entry Form was entered into a computer system that was referred to when she went to compare the signature cards and she believed all this information was entered in this database. Ms. Gamero mentioned a potential system "Phyzer". Pursuant to our previous request 12 and 13 (among others), provide screenshots/printouts of the Harborview "Customer Profile" in this system or state otherwise that this information is not available. In that situation, at a minimum, provide an example of the information available in a customer profile for a business account client.

   **RESPONSE:** Upon advice of counsel, objection. This document demand is overly broad, vague and ambiguous. Subject to and without waiver of the foregoing objections, please see documents produced at CRB001754-CRB001759.

Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

8. Ms. Gamero testified about a software called World Check. Appreciating it may not have been used, if "World Check" was used relative to any of the four suspicious wires, pursuant to our previous requests 17 and 18 (among others), provide any information provided by World Check or notes about information in World Check relative to the four suspicious wires. In the alternative, state World Check was not used.

   **RESPONSE:** Upon advice of counsel, objection. This document demand is vague and ambiguous. Defendant further objects to this demand to the extent that the term "suspicious wires" implies that Defendant deemed the four international wire transfers to be "suspicious," which is not supported by the record.

   Subject to and without waiver of the foregoing objections, no documents exist which are responsive to this Request, as World Check was not used in the processing of the four international wire transfers.

   Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

9. CRB 001543 (subject to request bullet 2 above) notes a policy called "World Check Procedures" with pathway "(Q:)\Retail Banking\Wire Transfer\Policy & Procedures\Procedures\World Check Procedures". Pursuant to our previous request 39 (among others), produce this policy and all previous versions of this policy.

   **RESPONSE:** Please see documents produced at CRB001797-CRB001827.

   Defendant reserves the right to revise, supplement and/or amend this response at any time, up to and including at the time of trial.

# EXHIBIT 2

Page 105

1   -- I know you said you have knowledge of the
2   customer.  That's typically where the customer does
3   business.
4               Correct?
5        A.     In Lawrence?
6        Q.     Yes.
7        A.     Yes.
8        Q.     And this wire also is going to Hang Sang
9   Bank as the beneficiary bank.
10              Correct?
11       A.     Yes.  That's correct.
12       Q.     And that was in Hong Kong.
13              Correct?
14       A.     Yes, that's correct.
15       Q.     In China.  Correct?
16       A.     Yes.
17       Q.     And the information in sections one, two
18   and three of 1502 was the information that was put
19   into the bank's computer system for wiring purposes.
20              Correct?
21       A.     Yes, that's correct.
22       Q.     And if we go to 1503, please.  I'm going
23   to walk through the audit trail information with you.
24   Okay?
25       A.     Yes.

# EXHIBIT 3

Page 93

1    Q.    When you make a decision as to the OFAC
2    scan hit being a false-positive do you communicate
3    that with the OFAC compliance officer?
4    A.    No.
5    Q.    So when it says in this next sentence
6    that we have been looking at in CRB 223:  "If the
7    preparer is unable to determine if it is a true OFAC
8    hit the investigation be escalated to the OFAC
9    compliance officer prior to releasing the wire
10   transfer."
11         So I guess the only time the OFAC
12   compliance officer is involved is when there's an
13   escalation?
14   A.    Yes.
15   Q.    And at that time you don't -- do you
16   send it to the OFAC compliance officer or not?
17   A.    For escalation purposes?
18   Q.    Yes.
19   A.    Yes.  We would send that over to the
20   group, the e-mail group, which the officers should be
21   included in.
22   Q.    So the AML BSA group would include the
23   OFAC compliance officer?
24   A.    Yes.
25   Q.    Is there someone -- who was the OFAC