# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HARBORVIEW CAPITAL PARTNERS, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>CROSS RIVER BANK,<br><br>    Defendant. | Case No. 2:21-cv-15146 (EP) (SDA)<br><br>**OPINION**<br><br>October 23, 2025 |

**STACEY D. ADAMS, UNITED STATES MAGISTRATE JUDGE**

This matter comes before the Court on the Motion for Leave to File a Second Amended Complaint ("Motion to Amend") filed by Plaintiff Harborview Capital Partners, LLC ("Harborview") (ECF No. 131). Defendant Cross River Bank ("Cross River") has not opposed the Motion to Amend.[1] The Court decides this Motion without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1. For the reasons stated below, the Motion to Amend is **GRANTED.**

## FACTUAL BACKGROUND/RELEVANT PROCEDURAL HISTORY

### I.  Allegations

The parties are familiar with the facts and the procedural history of this case. (*See* ECF Nos. 44 & 45 (April 26, 2022 opinion and order granting Cross River's motion to dismiss with leave to Harborview to amend the allegations); ECF Nos. 64 & 65 (November 14, 2022 opinion and order denying Harborview's motion for reconsideration of the dismissal); ECF Nos. 98 & 99 (October 11, 2023 opinion and order administratively terminating Cross River's motion for

---

[1] Cross River had contended in correspondence filed before the Motion was submitted that it intended to submit opposition to any motion for leave to file a second amended complaint. (*See* ECF No. 129). Such opposition has not come to fruition.

summary judgment and granting Harborview's application to conduct further discovery)). The Court will therefore briefly present the relevant facts as alleged in the currently-operative Amended Complaint. (ECF No. 75).

Ephraim Kutner is the president of Harborview, a finance, equity, and advisory firm servicing commercial real estate assets. (*Id.* ¶¶ 7, 9). Gilles Gade is the president of Cross River, which is a bank. (*Id.* ¶¶ 2, 6). Based on a longstanding social relationship between Kutner and Gade, as well as Gade's personal assurances to Kutner concerning the security of accounts with Cross River, Harborview opened accounts and began to deposit funds with Cross River. (*Id.* ¶¶ 8, 11, 13–24, 33). Gade, who was knowledgeable about Harborview's business operations, knew that Harborview operated only in the United States and he was aware of the level of security that Harborview required for its deposits. (*Id.* ¶ 12). He assured Harborview its deposits were safe.

In accordance with Harborview's business-account-data form, which Harborview completed for Cross River pursuant to banking regulations, Harborview indicated: (1) that it anticipated only domestic financial activity; (2) that it did not conduct foreign business and did not make foreign wire transfers; and (3) "No" in response to the query, "Is Business Conducted of Foreign Nature." (*Id.* ¶¶ 34, 37, 38, 40–42). Harborview also designated the following personnel to be authorized signers: Kutner; Jonathan Kutner, who is the managing director and a principal; and Marilyn Tirado, Bara Dolinger, and Gershon Yarmush, who were administrative staff. (*Id.* ¶ 39). Harborview ultimately deposited $20,000,000 with Cross River. (*Id.* ¶ 25).[2]

At some point before August 16, 2018, unbeknownst to Harborview, Kutner's email was hacked. (*Id.* ¶ 54). The hacker, who was able to send and receive emails from Kutner's account without Kutner's knowledge, fraudulently directed a Harborview administrative staffer — later

---

[2] All references hereinafter to "Kushner" are to Ephraim Kutner, not Jonathan Kutner.

revealed to be Marilyn Tirado — to wire funds internationally. (*Id.* ¶¶ 55–57). Cross River thereafter processed four fraudulent international wire transfers from Harborview's account to Hang Seng Bank in Hong Kong: $420,000 on August 16, 2018; $95,000 on August 17, 2018; $325,000 on August 24, 2018; and $955,000 on August 27, 2018. (*Id.* ¶¶ 62, 63). As alleged by Harborview, "Upon receipt of each foreign wire transfer form, Cross River verbally contacted only Harborview's administrative staff person despite the fact that Cross River knew that the individual was allowed to authorize only domestic wire transfers." (*Id.* ¶ 64).

In the Amended Complaint, Harborview asserted only one count against Cross River, *i.e.*, for violations of N.J.S.A. 12A:4A-201 through N.J.S.A. 12A:4A-204, which concern banking security procedures for payment orders. (*Id.* ¶¶ 120–139).

## II. Summary Judgment Opinion

During the time period that the Amended Complaint was the operative pleading, Cross River moved for summary judgment in its favor. (ECF No. 77). District Judge McNulty administratively terminated that motion without prejudice on October 11, 2023, explaining that:

> Harborview might still develop the record to show, not only that Cross River was aware of general expectations regarding foreign transactions, but also that Cross River was in receipt of a specific directive limiting Tirado's authorization to domestic transactions. Indeed, discovery of Cross River's gathering, processing, discussion, and review of Harborview's past practices and instructions might uncover the existence of such a directive, as might discovery of Gade's communications and involvement.

(ECF No. 98 at 8). Judge McNulty then directed the parties to engage in discovery "limited to the issues that remain concerning the authority of Harborview's employee, the scope of Cross River's knowledge regarding that authority, and the commercial reasonableness of its procedures to verify the authenticity of the wire transfer." (*Id.* at 9).

### III. Motion to Amend

On the basis of information gleaned from that limited discovery, Harborview now files a Motion to Amend wherein it seeks to add to only the existing factual allegations. (ECF No. 131-2 pp. 4–32 (clean version); ECF No. 131-2 pp. 35–64 (redlined version)). Specifically, Harborview seeks to add the following language to those factual allegations that is in quotation marks:

- Scrutiny of Harborview's account data form "is standard procedure under the bank's Know Your Customer Policy, as it using these forms to give every client a 'risk rating' based on the business conducted of the customer" (ECF No. 131-2 p. 40 ¶ 36);

- Harborview completed and returned the business account data form required by Cross River in January 2018, "as it had done many times prior" (*id.* ¶ 37);

- In assessing Harborview's anticipated wire activity, Cross River's employee "denoted the risk rating as 'High' based on her review of the anticipated activity" (*id.* p. 41 ¶ 40);

- Harborview advised Cross River that it did not conduct foreign business or make foreign wire transfers, and "as the result of a 'high' risk rating, Cross River's Know Your Customer (KYC) policy required Cross River to 'identify and understand the general operating' environment and the 'relationship with a particular customer within their target market'" (*id.* ¶ 41);

- Concerning Harborview's bar on foreign wire transfers, "Harborview's Authorized Signers were given no authority to change the business practices of Harborview as told to Cross River" (*id.* p. 42 ¶ 43);

- Hang Seng Bank was "an entity that was flagged by Cross River's Office of Foerign [*sic*] Asset Control [("OFAC")] control software on each of the Wire Transfers" (*id.* p. 45 ¶ 63);

- Cross River verbally contacted only Harborview's administrative staff person "to verify the authenticity of the wire" (*id.* ¶ 64);

- Cross River did not investigate the foreign wire transfer request "as it was required to per its own KYC policy" (*id.* p. 46 ¶ 69);

4

- "Cross River did not conduct a 'heightened due diligence' review of four wires being sent to Tier 3 county [*sic*] as required by both its KYC and OFAC policies. This is despite the OFAC software flagging each of the wires as a 'potential match' before Cross River's staff deeming it a 'false positive" for every one of the wires" (*id.* pp. 48–49 ¶ 77(d));

- "Cross River failed to inform the customer that the recipient bank was flagged as a 'false positive' or that the wire room manager who made the determination that it was a false positive did not regularly have her determinations audited, did not have regular training, or did not have her practices aligned with bank practices" (*id.* p. 49 ¶ 77(e));

- "The account opening form information was available to all Cross River employees, including the wire room staff at all times in Cross River's customer information database" (*id.* ¶ 77(f));

- "Despite this change in Harborview's business practice, Cross River did not conduct an investigation in Harborview, a 'high risk' client. As required by its own KYC policy, when a 'triggering event', including 'changes in the nature of the account activity' occur, Cross River's policy requires a 'site visit[] of high risk customers.' No such site visit occurred" (*id.* ¶ 77(g));

- "Cross River's policy requires it to monitor for 'significant changes in activity, ownership, or public information about the client become known.' To accomplish this, Cross River states that 'The Bank uses an automated monitoring system in order to monitor account activity, on an ongoing basis' and that this would be monitored on 'a daily basis.' This daily review should have caught unusual activity related to 'OFAC Screening', 'return item[s]' and when 'wire transfers that have no apparent business purpose to of [*sic*] from a foreign country' that are 'inconsistent with the customer's legitimated business purpose.' As a result of these daily reviews, Cross River mandated it would be 'initialing the Daily Account Review Log or the report printout.' This was not done and as such Cross River was not monitoring its customer's authorizations as its own policies require" (*id.* pp. 49–50 ¶ 77(h));

- "Cross River's policy identifies that as to certain customers, there could be a higher vulnerability to 'identify theft, embezzlement, and fraudulent schemes.' As a result, the KYC policy is designed to protect and look out for such patterns. While this policy is geared towards 'elderly individuals', Cross River clearly

5

had the means to identify fraudulent schemes but did not employ it to a 'high risk' account" (*id.* p. 50 ¶ 77(i));

• "Cross River's OFAC policy failed to provided [*sic*] sufficient protections from money ending up in the hands of foreign bad actors" (*id.* p. 51 ¶ 77(o));

• "Each of the Fraudulent Transfers was subject to an OFAC 'potential match'. Cross River's wire room manager flagged all wires as 'false positives'. Cross River failed to identify why so many consecutive, suspicious wires were all flagged as 'false positives'. Had Cross River engaged any security procedure, due diligence, or heightened due diligence into 'false positives', such as comparing the hits against the business practices of Harborview, it would have immediately identified that the fraudulent transfers were 'suspicious activity' as identified by its own policies and procedures" (*id.* ¶ 79);

• "Cross River's OFAC policy also failed to 'address how it will determine whether an initial OFAC hit is a valid match or false hit' as stated in the 'Bsa/aml Manual' released by the FFIEC" (*id.* pp. 51–52 ¶ 79(a));

• "Cross River employees failed to provide a sufficient memo or log of why the False Positive determination was made" (*id.* p. 52 ¶ 79(b));

• "Cross River's 'daily' audit failed to identify these false positives or flagged so many false positives consecutively from the same entity" (*id.* p. 52 ¶ 79(c));

• "According to Cross River's Wire Room Policy, the use of a phone call is designed to authenticate and verify a wire. The Wire Room Policy does not denote that a phone call in any way is designed to be a security procedure or that the phone call should try to determine whether the wire was being fraudulently generated" (*id.* p. 60 ¶ 128(a));

• "Cross River's reliance on a phone call does not appropriately fall under the determination of a security procedure as no questions were asked by Cross River's employees about the nature of the transaction or that the transaction was a deviation from the pattern or practice of a high-risk customer" (*id.* ¶ 128(b));

• "Cross River failed to establish procedures that were sufficiently monitored on a daily basis that were required by the policies themselves" (*id.* p. 61 ¶ 130(a));

6

- "Cross River failed to provide sufficient training and alignment to its own staff as to all its employees to understand the difference between an authorization call and a security procedure" (*id.* ¶ 130(b));

- "Cross River failed to maintain a written policy to identify fraudulent schemes such as CEO Fraud" (*id.* ¶ 130(c));

- "Cross River failed to conduct an investigation into a high-risk client having a 'triggering event'" (*id.* ¶ 130(d)); and

- Harborview alleges that Cross River "failed to maintain adherence to its own internal bank policies, including but not limited to its Wire Room Policy, its Know Your Customer Policy, and its OFAC policy" (*id.* p. 62 ¶ 136).

Harborview does not seek to assert any additional legal counts. Cross River has not filed any opposition to the Motion to Amend.

## LEGAL ANALYSIS AND DISCUSSION

### I. Standard for Motion to Amend under Federal Rules of Civil Procedure 15 and 16

"The threshold issue in resolving a motion to amend is determining whether the motion is governed by Rule 15 or Rule 16 of the Federal Rules of Civil Procedure." *Wright v. Cnty. of Camden*, No. 21-cv-13158, 2022 WL 3536013, at *3 (D.N.J. Aug. 18, 2022). When a party moves to amend a pleading "after the deadline in a district court's scheduling order has passed, the 'good cause' standard of Rule 16(b)(4) … applies," and a "party must meet this standard before a district court considers whether the party also meets Rule 15(a)'s more liberal standard." *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020); *see WAG Acquisition, LLC v. Gattyan Grp. S.A.R.L.*, No. 14-cv-02832, 2020 WL 5105194, at *2 (D.N.J. Aug. 31, 2020) (holding same); *Adams v. Republic Servs., Inc.*, No. 12-cv-00267, 2014 WL 12610152, at *2 (D.N.J. Sept. 16, 2014) (holding same).

7

Once a scheduling order has been entered, it "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Whether "good cause" exists depends on the moving party's diligence. *UPMC*, 970 F.3d at 319. Good cause requires that the moving party demonstrate that the deadlines set forth in a scheduling order cannot reasonably be met despite the diligence of the party seeking the extension. *See Carroll v. Del. Port Auth.*, No. 13-cv-2833, 2015 WL 12819181, at *3 (D.N.J. Mar. 31, 2015).

If a moving party meets its burden under Rule 16, the Court must then assess the application under Rule 15, which requires the Court to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Third Circuit has adopted a "liberal" approach to amendments of pleadings under Rule 15. *DLJ Mortg. Cap., Inc. v. Sheridan*, 975 F.3d 358, 369 (3d Cir. 2020); *see Long v. Wilson*, 393 F. 3d 390, 400 (3d Cir. 2004). A court may deny a motion for leave to amend under Rule 15 only where there is: (1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice; (4) repeated failures to cure deficiencies; or (5) futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 1984) (citing *Foman*). These factors "are not exhaustive, allowing a court to ground its decision, within reason, on consideration of additional equities, such as judicial economy/burden on the court and the prejudice denying leave to amend would cause to the plaintiff." *Mullin v. Balicki*, 875 F. 3d 140, 149–50 (3d Cir. 2017). However, the most important factor is prejudice to the non-moving party. *Id.*

**II.     Rule 16**

Harborview does not address the Rule 16 standard in its brief in support of the Motion to Amend. However, the Court will assess that standard as a first step here in an excess of caution.

8

The last explicit deadline to move for leave to amend the pleadings had expired on December 8, 2022. (ECF No. 67). The time to so move was not formally extended when the order administratively terminating the motion for summary judgment was entered on October 11, 2023. (ECF Nos. 98, 99). However, the underlying opinion entered on October 11, 2023 contemplated further discovery "concerning the authority of Harborview's employee, the scope of Cross River's knowledge regarding that authority, and the commercial reasonableness of its procedures to verify the authenticity of the wire transfer." (ECF No. 98 p. 9). This implies that an amended complaint might be necessary following the limited discovery. In addition, discovery was stayed while the motion for summary judgment was pending at the request of *Cross River*, not Harborview. (ECF No. 96). Further, on March 17, 2025, this Court granted Harborview leave to file the Motion to Amend by March 31, 2025 (ECF No. 130), and Harborview did so in compliance with the Court's Order (ECF No. 131).

Under these circumstances, it would be unfair to prohibit the consideration of Harborview's proposed second amended complaint at this juncture. *See In re L'Oreal Wrinkle Cream Mktg. Pracs. Litig.*, No. 12-cv-03571, 2015 WL 5770202, at *3 (D.N.J. Sept. 30, 2015) (finding that to hold plaintiff to an original amendment deadline when discovery deadlines have been repeatedly extended "makes zero sense"). Harborview acted diligently in pursuing discovery once the opinion and order addressing the motion for summary judgment were entered and discovery was no longer stayed, and it timely sought an extension to move for leave to amend. To refuse to address the Motion to Amend here would lead to an unjust result. *See Batta v. HCL Am., Inc.*, No. 17-cv-05988, 2019 WL 6888407, at *2 (D.N.J. Dec. 17, 2019) (holding that "[w]hile the Court acknowledges that it did not explicitly extend the deadline for Plaintiff to file a motion to amend, it would be unreasonable to hold Plaintiff to the initial . . . deadline to amend when fact discovery has been

on-going in this matter and typically a motion to amend pleadings is near the close of fact discovery"); *EBIN N.Y., Inc. v. Young Chul Lee*, No. 17-cv-13509, 2019 WL 5168624, at *2 (D.N.J. Oct. 11, 2019) (holding that "[r]equiring amendment prior to any real discovery is not fair"). Therefore, the Court finds the Motion to Amend clears the initial hurdle set by Rule 16.

### III.    Rule 15

The Court must address the *Foman* factors in view of Rule 15 under the next step of the analysis. *See* 371 U.S. at 182. First, the Court finds that there has been no undue delay on the part of Harborview. The October 11, 2023 opinion and order administratively terminating Cross River's summary judgment motion contemplated further discovery by Harborview on certain issues, and it stands to reason that Harborview would seek to flesh out its allegations based on that further discovery. In addition, "[t]he mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay." *Cureton v. NCAA*, 252 F.3d 267, 273 (3d Cir. 2001) (citing *Adams v. Gould Inc.*, 739 F.2d. 858, 868 (3d Cir. 1984)). Harborview certainly did not engage in "protracted and unjustified" delay, particularly in view of the contemplated further discovery, and cannot be seen as being guilty of "a lack of diligence sufficient to justify discretional denial of leave." *Mullin*, 875 F.3d at 151. Thus, the first *Foman* factor weighs in Harborview's favor.

For the same reasons discussed as to the first *Foman* factor, the Court finds that Harborview has not engaged in bad faith or dilatory motive in filing the Motion to Amend at this juncture. Again, Harborview was invited to engage in further discovery in the October 11, 2023 opinion addressing summary judgment. (ECF No. 98). Harborview cannot be faulted for doing so and consequently seeking to amend its factual allegations as a result. Thus, the second *Foman* factor weighs in Harborview's favor.

As to the third *Foman* factor, "prejudice to the non-moving party is the touchstone for the denial of an amendment." *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (internal quotation marks and citation omitted). In evaluating prejudice, the Court should consider "whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories." *Cureton*, 252 F.3d at 273. Here, there will be no undue prejudice to Cross River if the amendments are permitted. The proposed amendments are the result of the contemplated further discovery. *See Hagans v. Nat'l Mentor Healthcare, Inc.*, No. 22-cv-00128, 2024 WL 3024892, at *3 (D.N.J. June 17, 2024) (holding that "courts have not found undue prejudice when a party moves to amend while discovery is still open"). In addition, Cross River chose not to oppose the Motion to Amend, which indicates it did not perceive itself as suffering from undue prejudice by the proposed amendment. *See Taylor v. Carco Grp., Inc.*, No. 22-cv-07547, 2023 WL 5950476, at *2 (D.N.J. Sept. 13, 2023) (holding defendants' lack of opposition to motion to amend weighed in favor of a finding that defendants would suffer no prejudice from the amendments). Furthermore, Harborview has not sought to add any new counts, and thus Cross River will not incur additional expense in defending itself because the legal landscape in this case remains the same. *See Major Tours, Inc. v. Colorel*, 720 F. Supp. 2d. 587, 614 (D.N.J. 2010) (holding that "[p]rejudice may involve requiring the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delaying the resolution of the dispute"). Therefore, the Court declines to find that there has been any undue prejudice.

As to the fourth *Foman* factor, the Court is unable to discern any evidence of repeated failures to cure deficiencies. There is nothing to address here, and thus this factor weighs in Harborview's favor.

As to the fifth *Foman* factor, the Court finds that the proposed amendments would not be futile. The October 11, 2023 opinion, in administratively terminating the motion for summary judgment, held that Harborview might be able to eventually show that Cross River was aware of Harborview's expectation that any foreign transactions would be scrutinized to the fullest extent, as well as its expectation that Cross River would be sufficiently alarmed if a Harborview employee sought to authorize a foreign transaction. (*See* ECF No. 98 at 9). Harborview's proposed allegations set forth above all concern its expectations that Cross River would question any foreign transaction and utilize the security protocols designed to prevent fraudulent foreign transactions, and they are well-within the scope of Judge McNulty's October 11, 2023 opinion and order. (*See* ECF Nos. 98, 99). Thus, the Court finds that the amendments would not be futile. *See Jackson v. Buechele*, No. 18-cv-17258, 2019 WL 3766393, at *2 (D.N.J. Aug. 8, 2019) (finding proposed amendments to complaint were not futile because plaintiff sought to cure the deficiency that was identified by defendants).

## **CONCLUSION**

For the foregoing reasons, Harborview's unopposed Motion to Amend is **GRANTED**. An appropriate Order accompanies this Opinion.

                                                                     */s/ Stacey D. Adams*
                                                                     Hon. Stacey D. Adams
                                                                     United States Magistrate Judge

Orig:  Clerk
cc:     Parties
        Evelyn Padin, U.S.D.J.