NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| HARBORVIEW CAPITAL PARTNERS, LLC, | |
| Plaintiff, | No. 21cv15146 (EP) (SDA) |
| v. | **MEMORANDUM ORDER** |
| CROSS RIVER BANK, | |
| Defendant. | |

**PADIN, District Judge.**

Plaintiff Harborview Capital Partners ("Harborview") brings a single claim under Article 4A of New Jersey's Uniform Commercial Code, N.J. Stat. Ann. § 12A:4A-101 to -507, to recover around $1.375 million[1] that Defendant Cross River Bank ("Cross River") wired from Harborview's account to a bank in Hong Kong. D.E. 135 ("Second Amended Complaint" or "SAC"). The transfers were set in motion by a hacker posing as Harborview's CEO who emailed Harborview's bookkeeper with instructions to send the funds abroad.

Cross River now moves for summary judgment. D.E. 138-1 ("Motion" or "MSJ").[2] Harborview opposes. D.E. 144 ("Opposition" or "Opp'n"). Cross River replies. D.E. 146 ("Reply"). The Court decides the motion without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b). For the reasons below, the Court will **DENY** the Motion.

---

[1] All monetary amounts in this Memorandum Order are in U.S. dollars.

[2] Cross River filed its Notice of Motion at D.E. 138.

## I.    BACKGROUND[3]

### A.    Factual Background

Harborview is a real estate finance firm.  H. SUF ¶ 1; CR. Resp. ¶ 1.  Ephraim Kutner is its President and CEO.  CR. SUF ¶ 12.  Cross River is a New Jersey bank with its principal place of business in Teaneck, New Jersey.  CR. SUF ¶ 2.  Harborview banked with Cross River, and its account eventually reached a balance of $20 million.  *Id.* ¶ 6.

On its account-opening Know Your Customer ("KYC") forms (the "Account Forms"), Harborview represented that its trade area was the United States, that its business was not "foreign in nature," and that its anticipated foreign-wire activity was zero.  H. SUF ¶ 8.  The Account Forms projected six monthly wires with a monetary volume of $6.8 million.  *Id.*  The Account Forms included five separate forms for authorized signers identified by Harborview, each of which stated that Harborview does not send foreign transfers.  *Id.* ¶ 9.  The Account Forms did not specify the scope of each authorized signer's authority: Harborview maintains the signers were identified only for domestic wires, whereas Cross River contends the forms impose no such limitation.  *See* H. SUF ¶ 10; CR. Resp. ¶ 10.  Among others, the authorized signers included Kutner and Marilyn

---

[3] The facts in this section are drawn from the parties' statements of fact:  (1) Cross River's Statement of Undisputed Material Facts, D.E. 138-4 ("Cross River SUF" or "CR. SUF"); (2) Harborview's Statement of Undisputed Material Facts in Opposition, D.E. 144-2 ("Harborview SUF" or "H. SUF"); (3) Cross River's Response to Harborview SUF, D.E. 147 ("Cross River Response" or "CR. Resp."); and (4) Harborview's Response to Cross River's SUMF, D.E. 144-1 ("Harborview Response" or "H. Resp.").

The facts in this section, and throughout this Memorandum Order, are undisputed unless otherwise indicated.  Because the Court denies the Motion on the ground that genuine disputes of material fact preclude judgment as a matter of law, it recounts only an overview of the record, viewed in the light most favorable to Harborview, the non-movant.

Tirado, Harborview's bookkeeper since 2017.  H. SUF ¶ 9; CR. SUF ¶¶ 25–28.  Cross River rated Harborview as "high-risk," a factor Cross River considers when releasing a wire.  H. SUF ¶ 36.

Tirado was trained to submit wires to Cross River and was the only Harborview employee who initiated them.  CR. SUF ¶¶ 25–28.  By August 2018, Harborview had sent 219 domestic wires through Cross River, none of which were foreign wires.  H. SUF ¶ 13.

At some point before August 16, 2018, Kutner's email was hacked.  CR. SUF ¶¶ 7–9.  The hacker set a rule to auto-delete all mail to Kutner's inbox, which allowed the hacker to send and receive emails without Kutner's knowledge.  *Id.*  Posing as Kutner, the hacker emailed Tirado to wire funds internationally to an account in Hong Kong.  *Id.*  Believing that the instructions came from Harborview's CEO, Tirado prepared four international wire transfers and affixed both her signature and Kutner's.  *Id.* ¶¶ 11–12, 29–30.

Tirado sent four wires to Hang Seng Bank in Hong Kong in August 2018:  (1) $420,000; (2) $95,000; (3) $325,000; and (4) $955,000 (collectively, the "Wires").  *Id.* ¶ 10.  The first wire for $420,000 was returned for reasons the parties believe to be "administrative."  H. SUF ¶¶ 14–16.  The other three wires—totaling $1,375,000—were successfully completed.  *Id.* ¶¶ 18–20.

Cross River called Tirado to confirm the Wires, which she did.  CR. SUF ¶¶ 33–34.  Cross River also ran the Wires through an Office of Foreign Assets Control ("OFAC") scanning program and each returned a "hit" for review.  H. SUF ¶ 43.  In turn, Cross River conducted a manual review of the Wires and determined that the hits were false positives, allowing the Wires to be processed.  *Id.*

Cross River's anti-money laundering ("AML") policy lists Hong Kong as a "tier-3" jurisdiction associated with fraud and other risk.  H. SUF ¶ 38.  Cross River's protocol for high-risk customers like Harborview required asking questions about where the funds were going,

whether it is a location where the customer does business, and looking into the transfer's beneficiary. *Id.* ¶¶ 36–37, 51, 57. Cross River's KYC standards required it to record Harborview's anticipated activity and to refer any deviation to its Bank Secrecy Act ("BSA") group. *Id.* ¶¶ 51, 57. Despite this, Cross River did not submit the Wires to the BSA group or the AML OFAC department for review even though the Hong Kong wires were a deviation from Cross River's written activity. *Id.* ¶ 58. Cross River does not know whether it ever filed a suspicious-activity report, and it admits the Wires "did not comport with Harborview's legitimized business purpose." *Id.* ¶ 56.

Kutner was not contacted to confirm any of the Wires. *Id.* ¶ 44. Kutner did not sign the four wires himself and, because of the hacker's auto-delete rule hiding the scheme, Kutner was unaware of the transfers. CR. SUF ¶¶ 8, 30. The Wires were the account's first foreign wires. H. SUF ¶ 22. The Account Forms recording Harborview's domestic-only profile were stored in Cross River's system and accessible. H. SUF ¶¶ 29–34. Cross River no longer reviews account-opening forms before sending wires once it knows its customers' patterns, practices, and how they do wires. *Id.* ¶ 31. Cross River's wire transfer manager does not recall reviewing the Account Forms before approving the Wires to Hang Seng Bank. *Id.* ¶ 32.

The parties dispute the characterization of three key matters. *First*, Cross River's witnesses disagree about whether international wires receive different treatment. H. SUF ¶ 45; CR. Resp. ¶ 45. Cross River's Chief Operating Officer Kathleen Nelson testified the bank does not have a separate procedure for international wires; the wire manager who approved the four wires at issue, however, testified that the wires required added due diligence and escalation to the AML and BSA departments. H. SUF ¶ 45; CR. Resp. ¶ 45. *Second*, Kutner attests that Cross River never offered—and Harborview never agreed to—any procedure for verifying either domestic or foreign

wires.  H. SUF ¶ 59; CR. Resp. ¶ 59.  Cross River objects that Kutner's certification does not support that assertion.  *Id.*  And *third*, the parties dispute whether Cross River knew that Harborview had not previously wired funds to Hong Kong.  H. SUF ¶ 17; CR. Resp. ¶ 17.

### B.      Procedural History

Harborview filed a complaint against Cross River in 2021, D.E. 1, which Judge Kevin McNulty, U.S.D.J., dismissed without prejudice in April 2022, D.E. 44 ("McNulty 1st Op.").  On Harborview's Article 4A claim, Judge McNulty reasoned that the Wires were "authorized" under § 4A-202(1) because Tirado was "indisputably authorized" to send them, and that Harborview "was tricked into authorizing the transfers, but authorize them they did, as the complaint itself makes clear."  *Id.* at 10–12.  Judge McNulty later denied reconsideration and distinguished *Patco Constr. Co. v. People's United Bank*, 684 F.3d 197 (1st Cir. 2012), where the First Circuit reversed a grant for summary judgment in an Article 4A case.  D.E. 64 at 7–8 ("McNulty 2d Op.").  Judge McNulty noted that in *Patco* the fraudsters reached the bank directly, so "Section 202(1) was not at issue," whereas in this action the fraudster "interacted with the authorized signatory," placing the case "under Section 202(1)."  *Id.*

In early 2023, Harborview amended its complaint, and Cross River moved for the first time for summary judgment.  D.Es. 75 & 77.  In October 2023, Judge McNulty noted that "discovery [was] far from complete," terminated Cross River's first motion for summary judgment, and ordered discovery "limited . . . to the authority of Harborview's employee, the scope of Cross River's knowledge regarding that authority, and the commercial reasonableness of its procedures to verify the authenticity of the wire transfer."  D.E. 98 at 9 ("McNulty 3d Op.").  Judge McNulty recognized that Harborview "might still develop the record to show . . . that Cross River was in receipt of a specific directive limiting Tirado's authorization to domestic transactions."  *Id.* at 8.

5

After discovery, Harborview filed the operative Second Amended Complaint, pleading a single Article 4A count and seeking $1,375,000 plus interest.  SAC ¶¶ 120–39.

## II.    LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.* (citing *Anderson*, 477 U.S. at 248).  The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party would bear the burden of proof at trial, summary judgment is inappropriate "unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law," and "real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" defeat the motion.  *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237–38 (3d Cir. 2007).

If the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), as are unsworn statements in memoranda and unsupported statements in pleadings, *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Indeed, "[i]f the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir. 1993). "The substantive law governing the dispute will determine which facts are material, and only disputes over those facts 'that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Marcangelo v. Boardwalk Regency Corp.*, 847 F. Supp. 1222, 1226 (D.N.J. 1994) (quoting *Anderson*, 477 U.S. at 248).

## III.   DISCUSSION

To prevail on summary judgment, Cross River needs to prove that the Wires were either (a) authorized under § 4A-202(1); or (b) effective under § 4A-202(2)–(3). N.J. Stat. Ann. § 12A:4A-202. The scope of Tirado's authority under § 4A-202(1) is genuinely disputed. To be "effective"—shifting the loss of the Wires to Harborview—Cross River needs to show that it and Harborview agreed to a commercially reasonable security procedure and Cross River accepted the Wires in good faith and in compliance with the procedure. N.J. Stat. Ann. § 12A:4A-202(2)–(3). Because Cross River bears the burden of showing that the Wires were "effective," it can prevail at summary judgment only by showing that a reasonable juror would be "compelled to find its way on the facts needed to rule in its favor on the law." *El*, 479 F.3d at 238.

As explained below, Cross River has not shown that the Wires were authorized as a matter of law and has not met its burden to show that the Wires were effective. The Motion thus fails. The Court first addresses Cross River's argument that past decisions in this case dictate the Motion's outcome, then explains why authorization here is genuinely disputed, and finally discusses why Cross River has not proved the wires were "effective."

**A.      This Court's Previous Decisions Do Not Foreclose the Motion**

Cross River's threshold argument is that the Court has already decided the Wires were authorized, so the law of the case forecloses revisiting that question. MSJ at 4; Reply at 5. That argument misunderstands both doctrine and posture. The law of the case doctrine states that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Mack v. Yost*, 63 F.4th 211, 231 (3d Cir. 2023) (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 117 n.21 (3d Cir. 2010)). But that doctrine counsels the Court's discretion—it "does not prevent a court from deciding a summary judgment motion based on record evidence in a way that differs from previous decisions that were based on allegations in the complaint." *Id.* (citing *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 329–30 (3d Cir. 2016)). That is "the fundamental distinction between a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56." *Wiest*, 812 F.3d at 329. And the doctrine reaches only issues a court "actually decided." *Africa v. City of Philadelphia*, 158 F.3d 711, 718 (3d Cir. 1998).

Judge McNulty's prior rulings in this case were all at the pleading stage. Judge McNulty's 2022 dismissal—which reasoned that Tirado was "indisputably authorized" to send the Wires—rested expressly on Plaintiff's 2021 complaint. McNulty 1st Op. at 11–12. The operative SAC, however, pleads no such allegation. *See* SAC. The SAC alleges that Tirado was "authorized only for domestic wires" and disputes whether her authority reached foreign wires. SAC ¶¶ 64–65.

8

Procedural history bolsters that the Court did not decide the authority issue at the pleading stage.  After dismissal in 2022, the Court did not treat authorization as settled.  To the contrary, Judge McNulty ordered discovery into "the authority of Harborview's employee [and] the scope of Cross River's knowledge regarding that authority" and recognized that Harborview could still potentially develop a factual record that Tirado's authorization was limited to domestic transactions.  McNulty 3d Op. at 8–9.  The Court does not order discovery into a question it had already answered.  *See Lodato v. Ortiz*, 314 F. Supp. 2d 379, 388 n.5 (D.N.J. 2004) (rejecting argument that the court's denial of a motion to dismiss settled an issue as law of the case, and observing that the court's "prior order denying the motion to dismiss noted that added discovery would clarify issues in the case").  Accordingly, the Court proceeds to the merits.

**B.      Cross River is Entitled to Summary Judgment Only If It Proves Authorization or Effectiveness as a Matter of Law**

Article 4A of the Uniform Commercial Code ("UCC") "comprehensively address[es]" the rights and duties of parties to a funds transfer.  *ADS Assocs. Grp., Inc. v. Oritani Sav. Bank*, 219 N.J. 496, 500 (2014).  New Jersey adopted the UCC's Article 4A "to address electronic funds transfers."  *Harborview Cap. Partners, LLC v. Cross River Bank*, 600 F. Supp. 3d 485, 490 (D.N.J. 2022) (citation omitted); s*ee* N.J. Stat. Ann. § 12A:4A-101 to -507.

Article 4A's default rule is that "the bank will bear the loss of any unauthorized funds transfer."  *Regatos v. N. Fork Bank*, 257 F. Supp. 2d 632, 640 (S.D.N.Y. 2003); *see* N.J. Stat. Ann. § 12A:4A-204(1) (stating that a bank that accepts an order issued in a customer's name that is neither authorized nor effective "shall refund" the payment with interest).

A bank's first defense is authorization.  A payment order is "the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency."  N.J. Stat. Ann. § 12A:4A-202(1).

9

The second defense is effectiveness. "[T]he customer will be liable for an alleged fraudulent transfer if the bank and customer have agreed upon a security procedure to verify the authenticity of payment orders that is commercially reasonable and the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer." *Essgeekay Corp. v. TD Bank, N.A.*, No. 18-3663, 2018 WL 6716830, at *3 (D.N.J. Dec. 19, 2018) (citing N.J. Stat. Ann. § 12A:4A-202(2) (internal quotation marks omitted)). "The effect of [the effectiveness requirement] is to place the risk of loss on the customer if an unauthorized payment order is accepted by the receiving bank after verification by the bank in compliance with a commercially reasonable security procedure." *ADS Assocs.*, 219 N.J. at 513 (citing N.J. Stat. Ann. § 12A:4A-203 cmt.).

Cross River asserts both defenses. Neither, however, can be resolved in its favor as a matter of law on this record.

### 1.    *The scope of Tirado's authority is genuinely disputed*

Cross River argues that Tirado's status as an unrestricted authorized signatory, her training, and her course of dealing provided her authority to complete any order, including those for the Wires. MSJ at 6–10. Harborview responds that the only authority it ever conferred on Tirado is the same and only authority Cross River was ever shown—for domestic wires. Opp'n at 6–12.

"The power of an agent to bind [her] principal is limited to such acts as are within [her] actual or apparent authority." *Carlson v. Hannah*, 6 N.J. 202, 212 (1951). "Actual authority has been defined as the authority that the principal expressly or implicitly gave the agent." *United States v. Martinez*, 613 F.2d 473, 481 (3d Cir. 1980) (citation modified).

"Apparent authority arises when a principal acts in a manner as to convey the impression to a third party that the agent has certain power which he may or may not possess." *Rodriguez v.*

*Hudson Cnty. Collision Co.*, 296 N.J. Super. 213, 220 (App. Div. 1997).  Apparent authority "focuses on the reasonable expectations of third parties with whom an agent deals," so "a court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent."  *N.J. Lawyers' Fund for Client Protection v. Stewart Title Guar. Co.*, 203 N.J. 208, 220 (2010) (citations omitted).  Still, the authority must trace to the principal—not to what a fraudster instructs the agent to do.  *See Mesce v. Auto. Ass'n of N.J.*, 8 N.J. Super. 130, 135 (App. Div. 1950) ("Fundamentally, the liability of the alleged principal must flow from the act of the principal.").

The parties do not dispute whether Tirado could conduct domestic wires—she had done so 219 times.  H. SUF ¶ 13.  The contested question is whether her authority reached the Wires, which are the first four foreign wires in the account's history, after Harborview's Account Forms expressly stated that it did not send foreign wires.  On this record, a jury could find that Tirado had neither actual nor apparent authority.  The instruction did not in fact come from Harborview's CEO but from the hacker who "used the CEO's email account to direct" Tirado to conduct the Wires.  CR. SUF ¶ 9.  An impostor's command is not a manifestation of the principal under agency law.  *See N.J. Lawyers' Fund*, 203 N.J. at 220 (holding that actual and apparent authority must trace to the principal's own manifestations); *see also Regatos*, 257 F. Supp. 2d at 640 n.14 (denying a bank summary judgment in a forged payment order case, and explaining that an unauthorized order is "any order not initiated by the person identified as the sender or her agent," for which the bank bears Article 4A's default loss).

Without the hacker's fraudulent emails, what remains is Tirado's status as an authorized signatory and a years-long course of purely domestic dealing—neither of which establishes Tirado's authority over foreign wires.  Because actual authority "extends no further than the . . .

11

ordinary operations of the business," a jury could find that initiating a never-before-attempted category of transaction exceeded the authority Harborview actually conferred. *Reynolds Offset Co. v. Summer*, 58 N.J. Super. 542, 557 (App. Div. 1959).

Because apparent authority is measured by "manifestations of that authority by the principal"—here, Kutner—to Cross River, the only manifestation Harborview made about foreign wires was through the Account Forms, which explicitly disclaimed foreign wires. *See Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 338 (1993). A reasonable jury could find that Cross River could not have believed Tirado was authorized to send foreign wires when every signer form on file, including hers, said the company sends none. *See Apcoa, Inc. v. Fid. Nat'l Bank*, 906 F.2d 610, 615 (11th Cir. 1990) (affirming summary judgment against a bank on its apparent authority defense where the corporate resolution and authorization forms on file did not authorize the agent's conduct, leaving "no evidence that [the bank] . . . relied upon . . . authority granted by [the principal's] conduct").

At a minimum, Cross River was given "notice of a limitation [of Harborview's] authority [and was] put upon inquiry." *Keil v. Nat'l Westminster Bank, Inc.*, 311 N.J. Super. 473, 487 (App. Div. 1998) (citation modified). Indeed, Cross River's own wire manager agreed that through the Account Forms Harborview "told Cross River that it was not going to do business of a foreign nature." H. SUF ¶ 24. The dispute belongs to the jury to decide.[4] *Reynolds*, 58 N.J. Super. at 558

---

[4] Cross River's arguments to the contrary do not change the analysis. For express authority, Cross River asserts that "[o]n all four wire transactions, Ms. Tirado obtained explicit authority from Mr. Kutner to proceed." MSJ at 9. For implied authority, Cross River points to Tirado's authorized signatory status, two years of accounting study, and her bookkeeping role, as well as her routine practice of submitting at least 219 wires at Kutner's direction. *Id.* at 6–9. Cross River lastly notes that Tirado pulled the "INTERNATIONAL WIRE TRANSFER FORM" from Harborview's own files and signed it. *Id.* But it is the unusual nature of the Wires, when contrasted with that pattern, from which a jury could infer that the Wires were outside the authority Harborview conferred on

(reversing dismissal because the evidence of the agents' apparent authority presented a question of fact).

Cross River's cited authorities fare no better. Cross River's authorities share a feature absent in the record here: a concession or allegation that the customer authorized a disputed transfer. Cross River primarily relies on *Niram, Inc. v. Sterling Nat'l Bank*, 697 F. Supp. 3d 15 (S.D.N.Y. 2023), where a court granted a bank summary judgment on authorization under § 4A-202(1). In *Niram*, a company's own employees were deceived by a third-party hacker and executed the disputed transfer themselves. But *Niram* is distinguishable in three ways.

*First*, the customer there was bound by an agreement providing the customer was "bound by any and all Service Transactions . . . initiated by Authorized Users, to the fullest extent allowed by law" regardless of "whether [the transaction] was authorized or unauthorized" and was authorized to execute those wires "without limitation as to amount." *Id.* at 27–28. Cross River had no such agreement. H. SUF ¶ 59.

*Second*, the *Niram* customer conceded that the two other wires it sent during the same fraud window, which bore the same procedural irregularities, were legitimate. *Id.* The court held that the challenged transfers were executed "in the same manner" and thus were "necessarily" also authorized. *Id.* Here, Harborview makes no such concession and the record does not support the argument that the foreign transactions were of the same type as their 219 predecessors.

And *third*, *Niram* rested entirely on actual authority—not apparent authority—both of which are at issue here. Accordingly, because there is a genuine dispute of material fact, the question of whether Tirado had authority is for the jury.

---

Tirado.   That the parties dispute Tirado's title—whether she is a "senior accountant" or "administrative staff"—evidences that her authority is a question for the jury. CR. SUF ¶¶ 17–19.

    2.  *Cross River has not established that the Wires were "effective" as a matter of law*

Even if a jury found the Wires unauthorized, Cross River could still avoid responsibility for the loss by proving that the orders were "effective." For an order to be effective, Cross River needs to prove three elements: (1) an agreed-upon security procedure to verify the authenticity of payment orders; (2) that the procedure is commercially reasonable; and (3) that it accepted the payment order in good faith and in compliance with the procedures or any written agreement. *Essgeekay Corp.*, 2018 WL 6716830, at *3 (citing N.J. Stat. Ann. § 12A:4A-202(2)). Cross River bears the burden of this defense at trial, so it can prevail at summary judgment only by showing that a reasonable juror would be "compelled to find its way on the facts needed to rule in its favor on the law." *El*, 479 F.3d at 238. Each of the three elements is genuinely disputed.

    a.  <u>Agreement</u>

A security procedure exists only if the bank and customer agree to it. *See Essgeekay Corp.*, 2018 WL 6716830, at *3; *Chavez v. Mercantil Commercebank*, 701 F.3d 896, 903 (11th Cir. 2012). The agreement need not be a formal contract and may be inferred from a course of dealing. N.J. Stat. Ann. § 12A:1-201(b)(3); s*ee In re Bollinger Corp.*, 614 F.2d 924, 928 (3d Cir. 1980) (looking to "the transaction as a whole," including "course of dealing," to find a UCC agreement absent in writing); *Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 618 (8th Cir. 2014) (finding a security procedure "established by agreement" absent any formal written contract, where the agreement was "inferred from other circumstances"). However, a procedure Cross River "may follow unilaterally" is not a security procedure at all. *Chavez*, 701 F.3d at 903–04; *see* N.J. Stat. Ann. § 12A:4A-201 cmt. (stating a security procedure is one "established by agreement of a customer and a receiving bank" and "does not apply to procedures that the receiving bank may follow unilaterally in processing payment orders").

14

Cross River does not identify any such agreement as to foreign wires. Kutner attests that Cross River never offered—and Harborview never agreed to—any verification procedures. H. SUF ¶ 59. Cross River asserts only that Harborview "does not dispute" that signature verification and that "call-back and confirmation procedures[] were agreed upon for processing wire transfers." MSJ at 19. But Harborview "highly" disputes that assertion. Opp'n at 21. And fatally, Cross River does not include a cite to support this critical issue. *See* MSJ at 19.

Before the Wires, the only course of dealing between the parties was domestic. Whether those dealings amount to an agreed procedure for the Wires is a jury question.

### b.   Commercial reasonableness

Reasonableness is a question of law tied to "the circumstances of the customer known to the bank, including the size, type, and frequency of payment orders normally issued." N.J. Stat. Ann. § 12A:4A-202(3). A bank that processes an unusual order the same way it processes routine ones, ignoring what it knows about the customer, may be found to have acted unreasonably. *See Patco*, 684 F.3d at 212–13. In *Patco*, a seminal case on Article 4A, the First Circuit reversed summary judgment for a bank whose "collective failures" to act on its own fraud detection processes rendered its security system "commercially unreasonable." 684 F.3d at 211–14. A "one-size-fits-all" approach that ignores a customer's known habits "violates Article 4A's instruction to take the customer's circumstances into account." *Id.*

The admitted facts here support the same conclusion. Cross River treated the first foreign wire of Harborview—a domestic-only, high-risk customer—to a tier-3 jurisdiction like an ordinary domestic wire. H. SUF ¶¶ 29–38. Critically, Cross River's own COO and the wire manager who approved the Wires *disagree* on the reasonableness of its own procedures and what its procedures for international wires were. H. SUF ¶ 45; *see Essgeekay Corp.*, 2018 WL 6716830, at *3 (noting that commercial reasonableness depends on "the facts of each case").

15

To rule for Cross River at summary judgment would require the Court to balance the testimony of Cross River's COO and wire manager. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding that at summary judgment "a district court may not make credibility determinations or engage in any weighing of the evidence"). That is expressly forbidden by Rule 56. *Anderson*, 477 U.S. at 255.

Finally, Article 4A provides a safe harbor for banks if the bank offers a customer a reasonable procedure, the customer refuses it, and the customer "expressly agreed in writing" to the lesser procedure it chose. N.J. Stat. Ann. § 12A:4A-202(3); *see Choice Escrow*, 754 F.3d at 618–19 (bank prevailed at summary judgment after establishing safe harbor). Cross River cannot rely on the safe harbor. Indeed, Cross River offered no alternative, did not receive Harborview's refusal, and points to no written assumption of risk. Opp'n at 33. Commercial reasonableness here is a question for the jury.

### c.      Good faith and compliance

Good faith under Article 4A requires "the observance of reasonable commercial standards of fair dealing." N.J. Stat. Ann. § 12A:1-201(b)(20); *see Choice Escrow*, 754 F.3d at 622–23. Whether a bank accepted an order "in good faith and in compliance with" a procedure is a question of fact. *Essgeekay*, 2018 WL 6716830, at *11; *see Regatos,* 257 F. Supp. 2d at 640.

The record here is built largely from Cross River's own admissions including, among others, that it (1) cleared four consecutive OFAC alerts as false positives; (2) did not read the customer file before sending the wires; (3) did not refer an admitted deviation; and (4) does not know whether it filed a suspicious activity report. *See* H. SUF ¶¶ 29–34, 36–38, 43–44, 56–58.

To determine whether Cross River acted in good faith would require a fact finder to balance those issues. For example, a reasonable jury could find that Cross River's call to Tirado to confirm

a first-ever foreign wire that its own software had flagged was neither commercially reasonable nor made in good faith. And like commercial reasonableness, deciding Cross River's good faith and compliance would require weighing evidence—which the Court cannot do at summary judgment. *Marino*, 358 F.3d at 247. Whether Cross River acted in good faith and complied with any agreed-upon procedures are therefore questions for the jury.

Cross River bears the burden on all three elements for effectiveness loss-shifting, and a reasonable juror would not be "compelled" to find in its favor for any. *El*, 479 F.3d at 238. Therefore, whether the Wires are "effective" under § 12A:4A-202(2) is, too, for the jury.

## IV.    CONCLUSION

**IT IS**, on this **29th** day of June, 2026,

**ORDERED** that Defendant's Motion for Summary Judgment, D.E. 138, is **DENIED**; and it is finally

**ORDERED** that within 30 days of this Order, the parties shall jointly file a letter on the docket setting forth their availability for a status conference with the Hon. Stacey D. Adams.

_____
Evelyn Padin, U.S.D.J.

17